***********
Pursuant to an order by Deputy Commissioner Chapman filed March 2, 1999, the parties entered into the following:
 STIPULATIONS
1. The parties and the Industrial Commission agreed to a Consolidated Hearing on the legal issue common to all of the 92 cases listed in Exhibit A, attached to the written stipulations, and on certain legal issues unique to the cases involving Governmental Agencies, which issues are specified in Stipulation No. 2 below. (The cases involving Governmental Agencies were settled after the Pre-Trial Stipulations were filed.)
2. Plaintiff Medical Providers contended that the common legal issue for resolution at the Consolidated Hearing was whether the Industrial Commission was authorized to approve payment of the Medical Providers' claims utilizing the diagnostic-related-grouping ("DRG") based reimbursement system of the North Carolina Teachers' and State Employees' Comprehensive Major Medical Plan (the "State Health Plan") and whether the Defendants were obligated to pay the amounts approved by the Commission. Defendants contended that the common legal issue was whether the Industrial Commission exceeded its statutory authority in approving hospital fees in excess of the hospital's UB-92 amount. (Issues specified by the governmental agencies are omitted.)
3. Resolution of legal or factual issues other than those specified in Stipulation No. 2 above is stayed until there has been a full and final resolution of the specified legal issues by (1) hearing before the Industrial Commission and (2) appeal to the North Carolina appellate courts, if timely pursued by any of the parties.
4. These Stipulations are intended to simplify the factual issues for the Consolidated Hearing for the convenience of the parties, the Industrial Commission and the appellate courts, and are not intended to resolve any factual issues unique to any of the individual cases which may need to be later resolved by hearing or otherwise.
5. The employees listed in Exhibit A were within the course and scope of their employment with the employers listed in Exhibit A when they suffered on-the-job injuries for which they were entitled to workers' compensation benefits, including payment of medical expenses, under the North Carolina Workers' Compensation Act, as found at N.C. Gen. Stat. § 97-1 et seq.
6. Each employee listed in Exhibit A was admitted to the hospital listed in Exhibit A on the "Admission Date" listed in Exhibit A and was discharged from the hospital on the "Discharge Date" listed in Exhibit A.
7. The medical services rendered to each employee listed in Exhibit A by the hospital listed in Exhibit A for the admission set forth in Exhibit A were in treatment of the employee's on-the-job injury.
8. The employer and/or the employer's workers' compensation carrier in each case listed in Exhibit A is responsible for payment of medical services rendered to the employee by the hospital under the North Carolina Workers' Compensation Act.
9. Each carrier listed in Exhibit A was, at all relevant times herein, either the workers' compensation carrier for the employer listed in Exhibit A or was the administrator of the employer's partially or fully self-funded workers' compensation insurance program.
10. For purposes of the present Stipulations and the Consolidated Hearing only, in each case listed in Exhibit A, an original UB-92 claim form was timely submitted by the hospital to the employer and/or carrier for medical services rendered the employee during the dates of service listed in Exhibit A in connection with the employee's compensable injury.
11. Each hospital's total charges for the employee's admission is set forth on the UB-92 claim form and is listed in Exhibit A as "Total Charges."
12. The total charges shown on the UB-92 claim forms are the hospital's usual and customary charges, which are equivalent to the amount that the hospital would bill for hospital fees and expenses to any other private patient if the private patient were not covered: (1) for workers' compensation insurance benefits pursuant to the North Carolina Workers' Compensation Act, N.C. Gen. Stat. § 97-1 et seq.; (2) for health insurance benefits under the State Plan, N.C. Gen. Stat. § 135.40et seq.; or (3) under either a private health plan with whom the hospital has contractually agreed to reimbursement on a basis other than usual and customary charges or by a public Plan, such as Medicare or Medicaid.
13. Each UB-92 claim form contains diagnostic codes and procedure codes.
14. Each UB-92 claim form was submitted to the Industrial Commission for approval.
15. For purposes of the present Stipulations and the Consolidated Hearing only, in each case listed in Exhibit A, the Industrial Commission approved payment to the hospital in an amount greater than the total charges for the services described by the UB-92 claim form; the amount approved by the Commission is listed in Exhibit A as "IC Approved Amount."
16. For purposes of the present Stipulations and the Consolidated Hearing only, in each case listed in Exhibit A, the employer and/or carrier received either a "Medical Bill Display" or "Medical Bill Analysis" documenting the payment amount approved by the Industrial Commission.
17. For purposes of the present Stipulations and the Consolidated Hearing only, in each case listed in Exhibit A, the UB-92 claim form contains the correct procedure and diagnostic codes applicable to the medical services and treatment rendered by the hospital for the referenced admission.
18. For purposes of the present Stipulations and the Consolidated Hearing only, in each case listed in Exhibit A, defendants will not challenge that the payment amount approved by the Industrial Commission is the amount the hospital would have received under the DRG reimbursement system as implemented by the administrators of the State Health Plan for the services described by the UB-92 claim form, if those services had been covered by the State Health Plan.
19. For purposes of the present Stipulations and the Consolidated Hearing only, in each case listed in Exhibit A, the employer and/or carrier paid to the individual hospital the amount listed in Exhibit A as "Amount Paid."
20. The Pre-Trial Agreement dated October 23, 2001 which was submitted by the parties at the Deputy Commissioner hearing is incorporated by reference.
 *********** EVIDENTIARY RULINGS
All objections to evidence tendered were ruled upon in accordance with the rules of evidence and the findings in this case. Plaintiff hospitals raised objections to allegations by defendants which were not contained in the evidence of record. This decision is based upon the evidence presented. Statements made by counsel which were not supported by the evidence were disregarded.
 ***********
Based upon all of the competent evidence in the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. In 1994 the North Carolina Supreme Court filed the decision in Charlotte-Mecklenburg Hospital Auth.v. N.C. Industrial Comm., 336 N.C. 200, 443 S.E.2d 716 (1994) which held that the Industrial Commission did not have the authority under N.C. Gen. Stat. § 97-26 as the statute was then written to require hospitals to accept payment for medical services under a per diem rule. At that time, the statute read:
 "The pecuniary liability of the employer for hospital service shall be limited to such charges as prevail in the same community for similar treatment of injured persons of a like standard of living when such treatment is paid for by the injured person."
2. The Commission wanted more authority to set hospital rates and took steps to have N.C. Gen. Stat. § 97-26
amended as part of The Workers' Compensation Reform Act of 1994. As a result of those efforts, the statute was changed significantly. The relevant section then read:
 "(b) Hospital Fees. — Payment for medical compensation rendered by a hospital participating in the State Plan shall be equal to the payment the hospital receives for the same treatment and services under the State Plan."
3. The intent of the statutory change was to save employers and their insurers money spent on medical compensation by obtaining an overall discount from the hospitals' actual charges. However, after the new system was implemented, the Commission Administrator (now Commissioner) Thomas J. Bolch began to receive telephone calls from employers, insurance companies and third party administrators who were angry because they received Medical Bill Analysis forms from the Commission which directed them to pay sums higher than the actual hospital bills. In some cases, the approved payment amount was as much as two or three times the hospital bill as stated on the UB-92 Form.
4. Analysis of the problem revealed that the State Health Plan was using a statutorily mandated diagnostic — related-grouping ("DRG") system. In an effort to keep hospitals from "unbundling" services and to make the approval process for hospital bills simpler, a system had been devised whereby ten of thousands of hospital bills had been analyzed based upon the patients' diagnoses plus other factors. A base hospital rate was calculated by averaging the information in the database and a formula was then derived whereby certain factors, including the applicable diagnoses, the procedures performed and the length of hospital stay, were applied to the base rate to arrive at an amount which was supposed to reflect an average bill for that type of patient. Since the hospitals would be paid the same amount for every patient with the same diagnosis and circumstances, the theory was that the system would encourage hospitals to be more efficient such that patients would be treated with less expense so that the hospitals would make more "profit" on the admission. On the other hand, the calculations were supposed to produce an overall savings of 6.4 percent compared to the actual hospital bills on the UB-92 Forms.
5. The result of the DRG system was that the payments made to the hospitals were sometimes more than the actual hospital bill and sometimes less. The differences between the bill and the payment amount could be substantial. However, since all of the payments were being made by the same payor, the State Health Plan, it was assumed that the amounts would over time average to the desired percentage of the total actual hospital bills incurred.
6. The State Health Plan's DRG system was implemented in January 1995. The Plan used DRG software designed for all patients which was provided by 3M Corporation. The case mix on which the software was based included a high percentage of women's issues such as baby deliveries, since the state's teachers and other employees were covered by the State Health Plan. Statistically there were very few work-related injuries or diseases in the case mix since most of those were covered by workers' compensation and those bills would not have been included in the database. Although there was DRG software available which was specifically designed for workers' compensation hospital admissions, the State Health Plan did not use that software since it did not match the Plan's patients' demographics and were therefore inappropriate.
7. Despite the extensive computations, the State Health Plan ended up paying the hospitals overall more than the total UB-92 amounts for 1995 and 1996. The DRG system did not result in any savings whatsoever but rather increased the hospitals' income. Apparently, part of the problem was that 20,000 admissions per year was not sufficient to achieve an aggregate average.
8. The State Health Plan DRG system was even less effective when applied to workers' compensation claims. Not only was the case mix in the software mismatched for the nature of the diagnoses and procedures involved so that the approved payment amounts swung widely from much more to much less than the actual charges, but there were also many payors involved with the workers' compensation system, not just one payor as with the State Health Plan. Consequently, although the hospitals' receipts may have averaged out overall (which is not found as a fact), the amounts which the employers were required to pay did not come close to an average equivalent to the actual hospital charges.
9. When the telephone calls and complaints to Administrator Bolch became so frequent and vehement that it appeared that the system would "tear itself apart," Mr. Bolch decided that the Commission would stop approving hospital bills for amounts in excess of the actual charges. Mr. Bolch relied on N.C. Gen. Stat. § 135-40.7(8) as authority for his decision, on the basis that the DRG amounts were in excess of what a private patient would pay for the hospital services.
10. Before Mr. Bolch issued his directive, numerous hospital bills were approved at the higher DRG amounts. Each claim pending in this matter involved one or more hospital bills which were approved at a higher amount than the actual UB-92 charges.
11. The bills in issue were approved by the Industrial Commission as follows:
IC NO. UB92 AMOUNT DRG AMOUNT DIFFERENCE
D351650 $7,854.35 $12,308.40 $4,454.05
D378787 $9,769.46 $10,968.23 $1,198.77
D467935 $58,606.99 $123,251.40 $64,644.41
D479370 $3,971.10 $6,097.71 $2,126.61
D485161 $8,047.70 $19,763.96 $11,716.26
D508787 $13,194.89 $14,183.23 $988.34
D508787 $1,442.57 $5,960.56 $4,517.99
D508787 $4,819.06 $6,618.84 $1,799.78
D514043 $1,182.34 $5,024.49 $3,842.15
D518854 $4,560.46 $10,697.68 $6,137.22
D528324 $6,038.69 $14,541.93 $8,503.24
D552039 $3,215.33 $11,341.00 $8,125.67
D558328 $12,422.52 $13,950.63 $1,528.11
D561355 $6,094.03 $7,936.92 $1,842.89
D562823 $2,425.43 $5,422.76 $2,997.33
D562893 $6,325.25 $29,506.32 $23,181.07
D567586 $1,755.50 $4,368.76 $2,613.26
D572346 $3,222.10 $19,094.39 $15,872.29
D572346 $6,977.91 $16,120.01 $9,142.10
D572783 $4,205.46 $5,494.48 $1,289.02
D573835 $80,933.30 $127,315.52 $46,382.22
D575550 $5,188.62 $6,604.18 $1,415.56
D575550 $15,631.60 $25,840.23 $10,208.63
D577443 $4,408.90 $5,364.60 $955.70
D578072 $6,689.04 $7,209.73 $520.69
D580309 $3,964.15 $5,170.67 $1,206.52
D581799 $14,081.57 $18,779.45 $4,697.88
D583585 $9,631.40 $20,276.94 $10,645.54
D586034 $36,789.94 DISPUTED DISPUTED
D588565 $2,720.58 $4,409.73 $1,689.15
D593658 $1,963.93 $9,874.63 $7,910.70
D602959 $12,532.53 $19,094.39 $6,561.86
D604568 $9,231.82 $15,975.74 $6,743.92
D610923 $5,176.60 $7,379.98 $2,203.38
D612122 $4,637.31 $7,556.45 $2,919.14
D612454 $2,170.68 $5,803.95 $3,633.27
D613284 $2,842.50 $5,143.59 $2,301.09
D615876 $16,051.57 $19,483.96 $3,432.39
D620215 $13,861.00 $17,402.22 $3,541.22
D621478 $4,619.15 $5,769.75 $1,150.60
D622504 $9,836.74 $11,976.19 $2,139.45
D622928 $13,590.39 $20,033.99 $6,443.60
12. Defendants have paid the amounts they do not dispute to plaintiff hospitals, which in most cases was the actual hospital bill, but they have refused to pay the additional sum required by the DRG computation. Plaintiff hospitals correctly pointed out that, during the time in question, all but one of the defendants paid amounts lower than the hospital charges in other claims based upon the DRG computations. In one case, North Carolina Home Builders paid $59,204.20 less than the UB-92 amount; and Farm Bureau Mutual had a bill reduced from $20,432.15 to $5,422.76 which it paid at the approved amount. However, North Carolina Housing Risk Retention Pool, the third party administrator in D573836, did not receive any approved hospital bills for less than the actual charges and it received a DRG statement for $46,382.22 more than the UB-92 amount for the hospitalization involved in this case.
13. Each of the defendants in these workers' compensation cases had a property interest in the amount of money in dispute. Having admitted liability for the workers' compensation claim at issue, each was responsible for payment of the medical expenses incurred by the employee. In addition, the employers had a property interest in their future workers' compensation insurance premiums which would be based in part upon payments made in past claims. As stated by the Supreme Court:
 "Our workers' compensation system is not a `one payor' system. Rather, each employer is liable for medical compensation that may be required under the statute for its employees, and chooses thereunder to either self-insure or cover its risk through an approved workers' compensation insurance carrier, N.C.G.S. § 97-93; rates for such insurance are generally tied to the prior experience of the employer. Nor is our system serviced by `one provider'; that any hospital would receive, on average, its actual prevailing charges, based on that hospital's historical charges, would be a mere fortuity." Charlotte-Mecklenburg Hospital Auth. v. N.C. Industrial Comm., 336 N.C. 200, 226-227, 443 S.E.2d 716, 732 (1994).
14. Under N.C. Gen. Stat. § 97-2(b) as written during the period in question, the Industrial Commission was obligated to approve hospital bills in the amounts specified under the State Health Plan. The State Health Plan's DRG system as it applied to workers' compensation claims was fundamentally unfair and served to "rob Peter to pay Paul." With an inappropriate database as the basis for the system, there was no reasonable hope or expectation that the approved amounts would come close to averaging actual UB-92 hospital charges, much less provide the intended savings. The fact that there were multiple payors who received and were responsible for paying the DRG computations caused the discrepancies between the charges and the payment amounts to be even greater and more egregious. The smaller carriers and the self-insured employers were faced with either paying amounts which were well in excess of the actual hospital charges for treatment rendered or contesting the Commission's authority to approve these bills at higher amounts than the charges. Mr. Bolch recognized the seriousness of the problem and decided to impose a cap of the actual hospital charges on the amounts approved by the Commission to the actual hospital charges. Mr. Bolch was convinced that the employers and carriers would otherwise refuse to pay hospital charges and in turn the hospitals would refuse to treat injured workers, creating a breakdown of the system.
15. Although there was a legitimate objective sought by the changes made to N.C. Gen. Stat. § 97-26(b), the changes enacted could not and did not reasonably achieve the intended purpose of reducing employers' costs for hospital expenses. Rather, the changes created a system whereby the approved payment amounts could obligate employers and their carriers to grossly excessive amounts as compared to the actual charges or could obligate hospitals to accept payments which were equally unfair.
16. The General Assembly quickly realized that the changes made to N.C. Gen. Stat. § 97-26(b) violated the legislative intent and in the following year repealed this section of the statute. The current law establishes maximum and minimum permissible charges by hospitals for workers' compensation cases. The present version of N.C. Gen. Stat. § 97-26(b) bars hospitals from collecting more than 100% of hospitals' charges, as reflected on the UB-92 form.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. During the time the contested hospital bills were incurred, the Workers' Compensation Act required employers and their carriers to pay the hospitals the same amount allowed under the State Health Plan for the treatment and services rendered to the injured employee unless there was a separate contract between the carrier and the hospital. N.C. Gen. Stat. § 97-26(b) (before amendment.)
2. Our courts have recognized that the goal of statutory construction is to give effect to the intent of the General Assembly. Austin v.Continental General Tire, 141 N.C. App. 397, 540 S.E.2d 824
(2000). N.C. Gen. Stat. § 97-26(b) was clear and unambiguous as it was then written. Consequently, it must be given its plain meaning without resort to judicial construction. Davis v. N.C.Dept. of Human Resources, 349 N.C. 208, 505 S.E.2d 77 (1998).
3. The Industrial Commission had no statutory authority to approve bills in any amounts except according to the State Health Plan. Tom Bolch, the Commission's Administrator, was not entitled to rely on N.C. Gen. Stat. § 135-40.7(8) to place a maximum cap on the State Health Plan payment amounts. That statute excluded from "covered expenses"charges for any services to which there was no legal obligation to pay, specifically any charges exceeding the charge which would have been made for a person not covered under the State Health Plan to the extent of the overage. The hospital charges (UB-92) are not dispute for purposes of this decision. Rather, the amounts approved for payment under the State Health Plan's DRG system are in dispute. The statute does not address that issue. Consequently, there was no statutory authority which would allow the Industrial Commission to place a cap on the sums due for hospital treatment. N.C. Gen. Stat. § 135-40.7(8).
4. Although defendants could appeal the payment amounts approved by the Industrial Commission arising from the hospitalizations in question, the Industrial Commission was bound by the provisions of N.C. Gen. Stat. § 97-26(b) (as it was then worded) and was required to apply the State Health Plan's computations to the submitted hospital charges at issue. Under the legislative mandate, as long as the amounts approved were correct according to the Health Plan, the Commission could not provide relief from the underlying problem and therefore could not reduce the approved amount regardless of the patent unfairness of a system which forced an employer to pay twice the actual hospital charges for treatment of the injured employee. Consequently, defendants had no effective procedural remedy to address a fundamentally unfair statutory mandate. N.C. Gen. Stats. §§ 97-2 et seq.; 97-26(b) (before amendment); 97-90.
5. The Commission recognizes, as the dissent points out, that caselaw may be conflicting regarding the Commission's authority to determine the constitutionality of a statute and certainly the Commission rarely makes such a determination. However, the Commission has been described as follows:
 "In the spectrum of administrative agencies, ranging as they do from executive regulatory and rule-making bodies to quasi-judicial tribunals deciding individual cases between private parties, the compensation Commission while deciding controverted claims is as far toward the judicial end of the spectrum as it is possible to go without being an outright court."
7 A. Larson L. Larson, Larson's Workers' Compensation Law, § 79.90 (1998). In Hogan v. Cone Mills Corp., 315 N.C. 127,337 S.E.2d 477 (1985), the Supreme Court stated that "it is apparent that the Industrial Commission possesses such judicial power as is necessary to administer the Workers' Compensation Act." Id. at 138, 337 S.E.2d at 483. The Court of Appeals in Jones v.Weyerhaeuser Co., 141 N.C. App. 482, 539 S.E.2d 380 (2000), agreed with the Commission that N.C. Gen. Stat. § 97-61.5 was not unconstitutional. In the cases at bar, after reviewing the totality of the circumstances and balancing the equities involved, it becomes clear to the Commission that the intent of the statute was not honored, juxtaposed against the facts of these cases. After careful review of the evidence of record, the Commission determines that based in equity we must find the statute unconstitutional and deny the claims of plaintiff hospitals.
6. The State Health Plan's All Patient DRG system in effect at the time in question was fundamentally unfair as it applied to workers' compensation claims pending before the Industrial Commission. Defendant employers and carriers were required to make payments which were not directly related to the actual cost of the care provided. Therefore, defendant employers and carriers had valid property interests in the thousands of dollars at issue and were entitled to due process of law before being deprived of sums which were not otherwise due as payment for relevant hospital treatment and services. U.S. CONST. amend. XIV.
7. Despite the technical ability to appeal the approved amounts and appear at a hearing, defendants had no true opportunity to defend their position under the statute since the Industrial Commission, being bound by the statute, did not have the authority to grant them relief even though the statutory scheme was fundamentally unfair. Consequently, N.C. Gen. Stat. § 97-26(b) as it was written during the time in question was unconstitutional. The statute deprived employers and their carriers of property without due process of law. U.S. CONST. amend. XIV; N.C. CONST. art. I, § 19; 16B Am Jur 2d, Constitutional Law § 902. See, Jones v. Weyerhaeuser Co.,supra; Clark v. ITT Grinnell Ind. Piping, Inc.,141 N.C. App. 417, 539 S.E.2d 369 (2000) (citations omitted).
8. In that the changes to N.C. Gen. Stat. § 97-26 enacted in 1994 did not reasonably or rationally relate to the purpose of the statute and were patently unfair to the employers and their carriers who were subject to the Workers' Compensation Act, the statute violated the due process clause of the Constitution. U.S. CONST. amend. XIV; 16B Am Jur 2d, Constitutional Law § 912.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. In that N.C. Gen. Stat. § 97-26(b), as written when the hospital bills at issue were incurred, has been found to be unconstitutional, plaintiff hospitals are not entitled to receive the additional amounts approved by the Industrial Commission over and above the actual hospital charges submitted.
2. Each side shall pay its own costs.
This 18th day of December, 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER